IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v.    )<br>)<br>)  CRIMINAL NO. 24-cr-00149-1 (JMC)<br>AFEEZ OLAMIDE LAWAL,  )<br>a/k/a "Ramafizz," "Fizzy,"  )<br>)<br>)<br>Defendant.    ) | |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, AFEEZ OLAMIDE LAWAL ("LAWAL") with the concurrence of his attorney, agree and stipulate as follows:

### Background

1. Defendant AFEEZ OLAMIDE LAWAL a/k/a "Ramafizz," "Fizzy" ("LAWAL") was a citizen of Nigeria and a resident of Maryland.

2. Co-defendant ROLIAT ABOSEDE OWOSHO a/k/a "Rolash" ("OWOSHO") was a citizen of Nigeria and a resident of the District of Columbia.

3. Bank of America ("BOA"), Capital One ("Capital One"), Green Dot Bank ("Green Dot"), J.P. Morgan Chase Bank ("JPMC"), PNC Bank, N.A. ("PNC"), Wells Fargo & Company ("Wells Fargo"), and State Employees Credit Union ("SECU") were financial institutions whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC") and/or the National Credit Union Share Insurance Fund ("NCSIF").

4. LAWAL held bank accounts in his own name at financial institutions including, but not limited to: Capital One account no. x2197, and Wells Fargo account no. x4624 and account no. x0535.

5. LAWAL also gained access to bank accounts held in the names of other individuals, including, but not limited to: Wells Fargo account no. x2954 held in the name of J.M., BOA account no. x3456 held in the name of J.M., and JPMC account no. x2492 held in the name of J.M.

6. OWOSHO held bank accounts in her own name at financial institutions, including, but not limited to: BOA account no. x7650, BOA account no. x2320, Wells Fargo account no. x1041, and JPMC account no. x8239.

7. A "money mule" was a U.S.-based individual who was used by perpetrators of fraud schemes to receive and transfer stolen funds through their financial accounts. A money mule was either a knowing or an unknowing participant in a fraud scheme and the laundering of funds. Frequently, individuals became money mules through communications with perpetrators of "romance" and/or "person-in-need" schemes.

8. A "money mule account" was a pass-through financial account held in the name of money mules and used by perpetrators of criminal activity to receive proceeds of crime. Perpetrators of criminal activity used money mule accounts as a means to conceal and obscure the nature, identity, and source of criminal proceeds and to transfer funds to themselves and others.

9. The Social Security Administration ("SSA") was an agency of the United States government and provided benefit payments, including Social Security retirement insurance

benefits, to eligible individuals ("beneficiaries"). SSA beneficiaries would receive their SSA benefits payments by either mailed paper checks or direct deposit payments.

10. SSA operated one or more websites and provided a range of online services to its beneficiaries. A beneficiary could establish a "My Social Security" ("MySSA") online account, and, using the MySSA web portal, could, for example, change his/her mailing address and phone number and choose to have benefit payments directly deposited by wire transfer into the beneficiary's designated bank account, rather than have a paper check mailed to the beneficiary's designated mailing address. A beneficiary could also change the designated bank account information for his/her direct deposit of his/her SSA benefit payments. Typically, when a beneficiary made such changes to his/her MySSA online account, as a security measure, SSA would send, via U.S. mail, a written confirmation of those changes to the beneficiaries' designated mailing address.

## The Conspiracy

11. From at least in or about January 1, 2018 through in or about January 31, 2021, within the District of Columbia and elsewhere, defendants LAWAL, OWOSHO, and others ("conspirators"), did knowingly conspire, combine, confederate, and agree to commit the offense of laundering of monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), by conducting and attempting to conduct financial transactions affecting interstate commerce, that is, the deposit, withdrawal, and transfer of funds to and from financial accounts, which involved the proceeds of specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, knowing that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions

3

were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity.

### Purpose of the Conspiracy

12.     It was a purpose of the conspiracy for LAWAL, OWOSHO, and other conspirators to willfully and knowingly conduct and attempt to conduct financial transactions involving the proceeds of unlawful activity in order to unlawfully enrich themselves.

### Manner and Means

13.     The manner and means by which LAWAL, OWOSHO, and other conspirators would and did carry out the objectives of the conspiracy during the times relevant to the Indictment included:

*Conspirators' Use of Money Mule Accounts to Transfer Funds*

a.      LAWAL, OWOSHO, and other conspirators established accounts in their own names and/or in the names of other individuals and/or gained control over other individuals' accounts, including but not limited to accounts at various U.S. financial institutions, banks, credit unions, and payment processors, for the purpose of receiving and transferring the proceeds of unlawful activity and to conceal and obscure the nature, identity, and source of unlawfully-obtained funds.

b.      Conspirators befriended and communicated with other individuals via social media platforms in an effort to gain their trust and ultimately to use and exploit these individuals as money mules. Some of the money mules were themselves victims of romance and/or person-in-need schemes.

c.      Conspirators provided money mules with false information regarding the need to open and/or use money mules' financial accounts and the need for funds to be transferred

to and from the money mules' financial accounts.

        d.      Using their own financial accounts, money mules conducted financial transactions on behalf of conspirators, including, but limited to receiving and transferring funds by wire, withdrawing funds in cash, and purchasing money orders.

        e.      Money mules trusted conspirators and provided conspirators with personal identification information and online access to their financial accounts. As a result, LAWAL and other conspirators established and/or accessed money mules' financial accounts in order to cause funds to be transferred from one account to another. Money mule accounts were used as pass-through accounts, in which funds, including unlawfully obtained funds, were transferred into and quickly transferred out of the money mules' accounts to others.

        f.      Conspirators caused and attempted to cause unlawfully obtained funds from a variety of sources, including, but not limited to social security benefits to be deposited into money mule accounts.

        g.      LAWAL and other conspirators then transferred and/or caused to be transferred unlawfully obtained funds from the money mule accounts to accounts held in the names of LAWAL, OWOSHO, and others. LAWAL admits that he and OWOSHO knew these transactions involved the proceeds of fraud.

        h.      LAWAL and OWOSHO used financial accounts in their own names for the purpose of receiving and transferring the proceeds of some form of unlawful activity, including the proceeds of wire fraud schemes. LAWAL admits that he and OWOSHO knew these transactions involved the proceeds of unlawful activity.

        i.      LAWAL and OWOSHO used financial accounts in their own names to receive and transfer the proceeds of unlawful activity to other individuals and entities within the

United States and/or overseas. LAWAL admits that he and OWOSHO knew they were receiving and transferring unlawfully obtained funds and that the transactions were designed, in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the unlawfully obtained funds.

j. OWOSHO transferred unlawfully obtained funds from her own financial accounts to LAWAL's accounts.

k. LAWAL and OWOSHO used some of the unlawfully obtained funds for their personal use and benefit and/or for the benefit of others.

l. While in the District of Columbia, OWOSHO and others conducted most of the financial transactions involving her accounts, including, but not limited to depositing, withdrawing, and transferring funds from her accounts.

m. LAWAL and OWOSHO communicated with each other by telephone over 300 times in order to coordinate conducting monetary transactions and to facilitate the movement of unlawfully obtained funds between financial accounts. Many of those calls were conducted while OWOSHO was located in the District of Columbia and LAWAL was outside the District of Columbia.

*Green Dot Accounts Opened in the Names of Others*

n. Conspirators, without authority, opened accounts at Green Dot in the names of other individuals.

o. Conspirators caused unlawfully obtained funds, including, but not limited to SSA benefits, unemployment benefits, and tax refunds to be deposited into these unauthorized Green Dot accounts.

p. Three Green Dot account cards in the names of other individuals were

mailed, not to those individuals' residences, but either to LAWAL's residence or within blocks of his residence in Maryland.

q.  LAWAL used Green Dot card(s) in the names of other individuals to make purchases for his own use and benefit, including, but not limited to purchasing U.S. Postal Service money orders, and items such as a $736.36 pair of men's shoes at Neiman Marcus and a $355.21 purchase at a Costco store in the District of Columbia.

*Source and Transfers of Unlawfully Obtained Funds*

14.  The funds involved in the financial transactions engaged in by LAWAL, OWOSHO, and other conspirators were derived from wire fraud schemes and/or a conspiracy to commit wire fraud by which conspirators unlawfully obtained SSA benefits, unemployment benefits, and tax refunds in the names of other individuals and caused those funds to be wired in interstate commerce to accounts controlled by money mules, LAWAL, OWOSHO, and other conspirators. As part of the schemes:

a.  Conspirators obtained personal identity information of SSA beneficiaries such as names, dates of birth, and social security numbers and established and/or accessed SSA beneficiaries' accounts through SSA's MySSA and iClaim portals as well as email accounts in the SSA beneficiaries' names.

b.  Conspirators, some of whom were located overseas, disguised and concealed their identities as they accessed SSA's portals by infiltrating university online systems and creating and/or taking over university online accounts.

c.  Conspirators then changed, without SSA beneficiaries' knowledge or authorization, information in SSA beneficiaries' accounts online, including beneficiaries' email addresses and direct deposit account information, so that beneficiary payments would be

deposited into money mule accounts controlled by LAWAL and other conspirators. For example, approximately 19 SSA beneficiaries had their account information changed to accounts held in the name of money mule J.M.

      d.      Similarly, other SSA beneficiaries had their deposit account information changed to Green Dot accounts opened without authority in their names.

      e.      Conspirators, posing as SSA beneficiaries, submitted online "mail holds" and "change of address" notifications to the United States Postal Service ("USPS") and designated that beneficiaries' mail be redirected to addresses controlled by conspirators so that SSA beneficiaries would not receive written notification of the changes to their SSA accounts and designated direct deposit accounts.

      f.      Once fraudulently obtained SSA beneficiary payments were deposited into money mule accounts, LAWAL and other conspirators quickly caused funds to be transferred to accounts controlled by others, LAWAL, and OWOSHO, including but not limited to LAWAL's Capital One account no. x2197, and OWOSHO's BOA account no. x7650.

      g.      Thereafter, LAWAL and OWOSHO quickly withdrew and/or transferred unlawfully obtained funds out of their accounts and/or used the funds for their personal benefit. LAWAL admits that he and OWOSHO knew that the funds were unlawfully obtained and that the speed of the transactions was designed, in part, to conceal the nature and source of the funds.

      h.      Conspirators also caused victims of other schemes, including, but not limited to romance and/or person-in-need schemes to deposit funds into money mule accounts. LAWAL and other conspirators then caused the unlawfully obtained funds to be transferred to accounts held by LAWAL, OWOSHO, and others. From their accounts, LAWAL and OWOSHO caused portions of those funds to be withdrawn and/or transferred in interstate and/or

foreign commerce to accounts in the names of other individuals.

   i. Conspirators also caused funds in the names of other individuals such as unemployment benefits and tax refunds to be unlawfully deposited into money mules' accounts and Green Dot accounts using the similar fraudulent methods described above. Shortly thereafter, LAWAL and other conspirators caused the fraudulently obtained funds to be withdrawn, transferred, and/or used via cash/credit cards for their own personal benefit or for the benefit of others.

   j. Between January 1, 2018, and January 31, 2021, LAWAL, OWOSHO, and other conspirators unlawfully obtained over $173,937.16 in SSA benefits, unemployment benefits, and tax refunds that did not belong to them. LAWAL and OWOSHO then conducted financial transactions involving the unlawfully obtained funds, including, but not limited to: (1) using the unlawfully obtained funds for personal benefit; (2) transferring unlawfully obtained funds to others; (3) using unlawfully obtained funds to purchase goods that were shipped to others and/or overseas; and (4) transferring unlawfully obtained funds overseas. The purpose of these financial transactions was designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership or the control of the unlawfully obtained funds which were proceeds of specified unlawful activity.

*Examples of Movement of Unlawfully Obtained Funds*

*SSA Beneficiary M.M.*

   k. Between March 28, 2018, and June 1, 2018, conspirators posing as SSA beneficiary M.M., accessed M.M.'s MySSA account without authorization and redirected their SSA benefits. On March 28, 2018, conspirators changed M.M.'s direct deposit account for their SSA benefits to SECU account no. x1679. On April 25, 2018, conspirators changed M.M.'s

direct deposit account to money mule M.B.'s Wells Fargo account no. x1387. As a result, on April 25, 2018, and June 1, 2018, M.M.'s two $3,384 SSA benefit payments were deposited into M.B.'s Wells Fargo account no. x1387.

      l.      Between April 25, 2018, and April 27, 2018, three $970 P2P transfers consisting of M.M.'s social security benefits were transferred from M.B.'s Wells Fargo account no. x1387 to LAWAL's Capital One account no. x2197. LAWAL promptly began withdrawing the funds in cash and/or using the funds for his own benefit.

      m.      On June 1, 2018, $500 in M.M.'s SSA benefit funds were transferred from M.B.'s Wells Fargo account no. x1387 to money mule J.M.'s Wells Fargo account no. x2954. That same day, at the direction of a conspirator, J.M. transferred that $500 to OWOSHO's BOA account no. x7650. OWOSHO promptly transferred the funds out of her account to another individual.

      n.      Between June 4, 2018, and June 5, 2018, two $970 P2P transfers and one $960 P2P transfer of M.M.'s social security benefit funds were made from M.B.'s Wells Fargo account no. x1387 to LAWAL's Capital One account no. x2197. By June 19, 2018, LAWAL either withdrew the funds in cash and/or spent the funds for his own benefit.

*SSA Beneficiary C.G.*

      o.      On November 14, 2018, conspirators posing as SSA beneficiary C.G. accessed C.G.'s MySSA account without authorization and redirected their benefits to another account not in C.G.'s name.

      p.      On November 15, 2018, conspirators posing as C.G. notified the USPS to delay C.G.'s mail.

q. On November 28, 2018, conspirators changed SSA's direct deposit account for C.G. to an account with Green Dot. That Green Dot account was opened in C.G.'s name without authority and received a $2,756 SSA benefit payment, but the payment was returned.

r. On December 14, 2018, conspirators changed SSA's direct deposit account for C.G. to money mule J.M.'s BOA account no. x3456. On December 18, 2018, as a result of conspirators' actions, SSA deposited C.G.'s $2,756 SSA payment into J.M.'s BOA account no. x3456. The day prior, on December 17, 2018, $3,000 was deposited into J.M.'s BOA account no. x3456 from individual(s) unknown to J.M.

s. On December 19, 2018, and December 20, 2018, LAWAL and/or other conspirators caused C.G.,'s SSA benefits to be transferred from J.M.'s BOA account no. x3456 to OWOSHO's BOA account no. x7650 in two P2P transfers, one in the amount of $2,000, the other for $1,530. By December 21, 2018, OWOSHO transferred the funds to another individual and used a portion of the funds for her benefit.

t. On December 21 and December 24, 2018, a $970 P2P and $1,230 P2P transfers were made from J.M.'s BOA account no. x3456 to LAWAL's Capital One account no. x2197. By January 2, 2019, LAWAL spent the funds for his own benefit.

*SSA Beneficiary J.L.*

u. On March 11, 2019, conspirators posing as SSA beneficiary J.L. accessed J.L.'s MySSA account without authorization and redirected their benefits to money mule J.M.'s BOA account no. x3456.

v. On April 10, 2019, conspirators caused SSA to deposit J.L.'s $2,039.10 benefit payment into J.M.'s BOA account no. x3456.

w.  On April 10, 2019, LAWAL and/or other conspirators caused a $1,020 P2P transfer of J.L.'s SSA benefits from J.M.'s BOA account no. x3456 to LAWAL's Capital One account no. x2197. That same day, April 10, 2019, LAWAL and/or other conspirators caused a $1,000 P2P payment using J.L.'s SSA benefit funds to be transferred to another.

x.  On April 15, 2019, LAWAL and/or other conspirators caused two P2P transfers for $820 and $594.50 from J.M.'s BOA account no. x3456 to LAWAL's Capital One account no. x2197. LAWAL then promptly used the funds for his own personal benefit.

y.  On May 8, 2019, conspirators caused SSA to deposit J.L.'s $2,039.10 benefit payment into J.M.'s BOA account no. x3456.

z.  On May 10, 2019, LAWAL and/or other conspirators caused a $1,000 transfer from J.M.'s BOA account no. x3456 to LAWAL's Capital One account no. x2197.

aa.  On May 13, 2019, conspirators posing as SSA beneficiary J.L. accessed J.L.'s MySSA account again without authorization and changed the recipient bank account to an account at Vystar Credit Union.

*SSA Beneficiary G.H.*

bb.  On May 30, 2019, conspirators posing as SSA beneficiary G.H. accessed G.H.'s MySSA account and without authorization redirected their benefits to money mule J.M.'s JPMC account no. x2492.

cc.  On June 12, 2019, conspirators caused SSA to deposit G.H.'s $2,628.00 benefit payment into J.M.'s JPMC account no. x2492.

dd.  On June 13, 2019, LAWAL and/or other conspirators caused $1,920.89 of G.H.'s SSA benefits to be transferred from J.M.'s JPMC account no. x2492 to LAWAL's Capital One account no. x2197. On June 18, 2019, LAWAL and/or other conspirators caused the

transfer of another $702.57 from J.M.'s JPMC account no. x2492 to LAWAL's Capital One account no. x2197. LAWAL promptly either withdrew the funds in cash and/or spent them for his own benefit.

*SSA Beneficiary D.C.*

ee. On June 16, 2020, LAWAL and/or other conspirators posing as SSA beneficiary D.C. opened a Green Dot account no. x5470, using D.C.'s personal identity information, including, but not limited to D.C.'s name. LAWAL and/or other conspirators caused a Green Dot card no. x2301 associated with the fraudulently opened Green Dot account no. x5470 to be mailed to an address in close proximity to LAWAL's residence in Silver Spring, Maryland.

ff. Between June 2, 2020, and January 21, 2021, conspirators caused SSA to deposit seven of D.C.'s SSA benefit payments totaling $23,049.60 into the fraudulently opened Green Dot account no. x5470. For example, on June 10, 2020, conspirators caused SSA to deposit D.C.'s $3,288.30 benefit payment into the fraudulently opened Green Dot account no. x5470.

gg. On the following dates, LAWAL and/or other conspirators used Green Dot cash cards in D.C.'s name to purchase multiple USPS money orders. For example, on July 6, 2020, LAWAL and/or other conspirators purchased two USPS money orders—one for $1,000 and the other for $500—at a USPS facility in Silver Spring, Maryland using a Green Dot cash card associated with account no. x5470. That same day, LAWAL and/or other conspirators purchased an additional two USPS money orders for $1,000 and $500 at a US Postal facility in Kensington, Maryland using a Green Dot Cash card associated with account no. x5470.

15. This proffer of evidence is not intended to constitute a complete statement of all facts known by defendant LAWAL but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for defendant's plea of guilty to the charged crime.

                              Respectfully submitted,

                              EDWARD R. MARTIN, JR.
                              United States Attorney

BY:    */s/ Diane G. Lucas*
         DIANE G. LUCAS, D.C. Bar No. 443610
         Assistant United States Attorney
         601 D Street, N.W.
         Washington, D.C. 20530
         (202) 252-7724
         Diane.Lucas@usdoj.gov

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, after consulting with my attorney, Nicholas G. Madiou, Esquire, I agree and stipulate to this Statement of Offense. The Statement of Offense is a summary made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me regarding theses offenses. I, Afeez Olamide Lawal, make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

Dated: 4/15/2025

Afeez Olamide Lawal
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense

Dated: 4.15.25

Nicholas G. Madiou, Esquire
Attorney for Afeez Olamide Lawal